First case of the afternoon, file 2-11-0994, people of the state of Illinois, representing Mr. Bryant. On behalf of Mr. Bryant, Mr. Paul Glazer, on behalf of the people, and this gentleman here. Good afternoon. Good afternoon, your honors, counsel, and may it please the court. Ed Bryant appeals his conviction for the offense of first degree murder, which followed a jury trial in Winnebago County. This is a reasonable doubt case. And one of the first questions that we usually get from the court during reasonable doubt cases is, well, didn't the jury hear the evidence, so why don't we, don't we have to respect the decision of the jury? My answer to that is that we respect the jury by carefully reviewing its decisions. You know, one of the things us appellate lawyers do sometimes is we rely on the old cases without just, just automatically, without necessarily reading them every case. So I went back and looked at Jackson v. Virginia, which is the case where the U.S. Supreme Court established that any rational trier of fact test, the rational jury test. One thing that the Supreme Court did not do in that case was say that reviewing courts should not review the evidence and should not hesitate to review, or should hesitate to review verdicts by juries. In fact, it recognized at page 321 of the opinion that courts can and regularly do gauge the sufficiency of the evidence without intruding into any legitimate domain of the trier of fact. But the court was saying that yes, what that case was was a federal habeas case. And it was talking about the relative authority of the federal courts to review decisions by state courts on the question of sufficiency of the evidence. And it said that one of the reasons we're going to not give the federal courts reason to overturn state courts willy-nilly is that the state courts do normally give full and fair consideration to the defendant's due process rights by giving a full review of the evidence. Now, True and Jackson have said that we look at the evidence in the light most favorable to the state. That's fine. Let's do that here. In fact, in Collins' case, the U.S. Supreme Court adopted Jackson v. Virginia and adopted the same theory. So fine. Let's look at the evidence in the light most favorable to the state. Let me call your attention to another case that we cited in our briefs, the Juan Rivera case, where this court said fact finder's acceptance of witness testimony does not guarantee reasonableness. Our position here is that the state's case is based on inherently unbelievable testimony. Now, the state criticized this in the brief by saying we don't really define the term inherently incredible. Your Honor, the state's two main witnesses in this case are themselves the dictionary definition of inherently incredible. We have basically a prostitute and a snitch. That's the state's case. The first, Patricia Smith, was – Well, I'd certainly – you know, we'd all certainly prefer if it was the, you know, the teacher of the year and the police chief. But we can't make witnesses appear. No, you can't, but that doesn't mean that, okay, we'll cut them some slack because that's the best witness, the only witness they can find. Let's accept them for the truth of what they said. Let's look at the light most favorable to the state. Let's look at Patricia Smith, who was convicted of retail theft in 2006 and didn't remember it, who was convicted of prostitution three months before the incident here. No, she said she didn't remember the arrest but remembered the conviction. Well, she didn't remember a lot of things, she also said. She couldn't remember a lot of things from around that time. She was charged with residential burglary for breaking into the victim's house, maybe at the time of the offense. We don't even know that looking at the light, the events of light most favorable to the state. She's on medication. She had a bipolar disorder. She was hearing voices. Maybe it was her voice. She smoked, but she admitted she smoked crack. She did drugs on the day she didn't go visit the doctor. She admitted getting high and spending time with a friend, quote-unquote, on the night of the homicide occurred. This is their witness. Yeah, okay, she's not the professor or teacher of the year, but that's what we have. Then we have Prince Bey, who had a conviction for home invasion, residential burglary. Just got through serving 17 years in prison for that. He had attempt obstruction of justice, aggravated battery conviction. He was in custody at the time of this trial awaiting sentencing on a federal heroin delivery charge, in which he faced anywhere from four to 40 years, and anywhere from a maximum to a medium, minimum security institution. He had a lot of writing. Even though he had a deal going with the state in this case, it's simply incredible to believe that a person who's awaiting sentencing isn't going to want to try to curry some favor with the prosecution. And also, I forgot to mention, Patricia Smith was testifying in this case pursuant to a cooperation agreement with the state. So these are two witnesses who are not believable witnesses. Now, Rivera teaches us a couple other lessons. First, that a witness has hopes of reward from the state. The testimony can't be accepted unless it carries with it an absolute conviction of truth. This applies to both Smith and Bey. Narcotics addicts are subject to suspicion because visual users become notorious liars. Both Smith and Bey admitted doing drugs around the time that important things happened here. Smith was doing crack that night, and Bey was doing crack and marijuana before he got arrested and thrown in the lockup. And as to Bey, we know from Rivera and other cases, jailhouse informants should be treated with caution because they're not inherently reliable. The rest of the state's case, we have a single bloodstain on my client's shorts, and to which my client explained how it got there. Again, Rivera tells us DNA simply corroborates identity. It doesn't corroborate the crime occurred. The police retrieved, with my client's consent, a whole lot of laundry, a whole lot of stuff from my client's room, which was next door, not at the victim's house, as the state erroneously says in their briefs. But they got his pants, or his shorts, his T-shirt, his socks, his shoes, and all they got was one stinking little bloodstain, which is a mix between his blood and the victim's blood. That's all we have. There's no explanation, any motive here whatsoever. My client would hang out with Mr. Jacobson. They were friends from all appearances. It was unrebutted that they hung out together. No one testified that they had any fight. There was no explanation. Jacobson's car was found some four or five blocks to the west of his house the day after he was used by him. It makes no sense for my client to have taken the car. I wasn't charged with it, but why would my client take the car, drive five blocks west, and then go live next door? It just doesn't make sense here. There's no explanation. Smith was a friend, too. Smith was a friend, too, yet my client never made admissions to Smith about having been responsible for this event. Again, looking at the events of light, most favorable to the state, what do we have here? We have Patricia Smith walking in at his house, hearing some metal in the basement, and she said, of course, this person hears voices, here is the victim call out to name that. I think maybe we all got led to believe that when she walked in the house, that was when the murder was taking place. What if it wasn't? What if the murder occurred some other time? There's a big dispute about whether the radio was on or wasn't on. Was the police experiment to listen to the radio and the voices? Was that accurate or not? That may be leading us down the wrong, a blind alley here. And it's entirely possible that Smith came in earlier in the evening and the murder occurred some other time. Maybe the victim heard Smith come in and said, Ed, is that you? And then she ran off. Again, looking at the evidence of light, most favorable to the state, her testimony doesn't establish that my guy committed the crime here. And Mr. Bay, my client was in jail for like three or four years before he stood trial in this case. What we have to believe, to believe the state, is that the only guy in the world that my client made an admission to, he was friends with Patricia Smith, never said anything incriminating to her. He talked to the police, didn't make any admission to the police. The only person in the history of the universe that he made any admission to was this Prince Bay character who he just happens to see that first day and says, how are you doing, Prince? By the way, I killed the guy. And yet neither guy is in the lockup. None of them were called to testify to corroborate they were even talking, let alone what they were talking about. There is simply no corroboration for what Prince Bay said. And Prince Bay's also his recollections or his testimony, his account of what my client told him, didn't match up with the offense. He says, my client said I hit an old man in the head. Well, Jacobson was 51. He was younger than my client, not older. And he hit him in the head with a table leg. There was no table leg in the scene. Certainly the pathologist said, yeah, it could have been a table leg. But they're just, you know, it was a blunt force through something. And the evidence in the scene made it pretty clear there was a brick that was used against, it inflicted the fatal blow. And secondly, the jury below tried to do its job. They sent a letter to the judge during the liberation saying, we see the odds of that ATM transaction regarding the sale of the shoes the day before, whether it was the day before or two days before the day of the homicide and whether that's the key part of the case. I don't know. It might have been. But, again, we have a picture of Smith saying it happened a certain day and defendants saying it happened some other day. But the jury was trying to do its job, but the judge properly said, no, that wasn't an evidence. You can't hear it. So the jury tried to do its job. It just couldn't do it. So what Mr. Bryan is asking this court to do is to respect the concept of a jury verdict, but also to respect and uphold the standard of reasonable doubt and to reverse his conviction. Thank you. Any questions? Where's the line between looking at the sufficiency of the evidence and looking at, if you take away the issues that make the prior convictions, the drug use, you take that away and look at the testimony, would you agree that the testimony is sufficient or insufficient for a jury, in the light most favorable to the state, to have convicted your client? I think you can't view things in such a vacuum. I think you have to look at who is saying what they're saying. If we have teacher of the year or outstanding citizen say, I saw the defendant do it, he was wearing a red shirt, we can believe that. If we have a drug addict, if we have a jailhouse snitch say, yeah, I saw the defendant do it, or the defendant said he had it and he had a red shirt, I think it's subject to disbelief by any rational trier of fact. And I think sometimes the jury gets caught up in what they hear and ignores. My question, though, is aren't we to discriminate between things that would go to credibility, in other words, I'm a prior conviction, I'm a drug addict, I'm a prostitute, I was using drugs that day, those things, versus the substance of what was introduced into evidence was or was not sufficient to meet the burden on each and every one of the elements. I think the answer to that is in the quote we provided on page two of our reply from Hume v. Malich, a 1918 case, where the onus is to consider there may be such an inherent probability and testimony of awareness that we just can't, don't have to believe it. And here we have two witnesses who are so inherently incredible, they're simply unworthy of belief. And looking at, even if you look at their status in the light most faithful to the state, there's simply no rational jury that could believe what these two people came to try to sell. So it's the weight is, the weight of the testimony is so minimal that it really doesn't matter what they testify to. Yes. And also what they testify to, again, Patricia Smith didn't say she saw my guy commit the crime. She simply walked in the house and heard some noise. Okay, that doesn't prove anything. And we have a jailhouse snitch who's inherently unreliable saying my man made some statements that don't match up with the crime. That's inherently believable. All right. We're talking about, though, the testimony, not the person themselves being inherently unreliable or improbable. And are you saying, I mean, it is what they testified to and what the jury heard is contrary to the laws of nature or human experience and so incredible and beyond the limits of human belief that the testimony itself demonstrates the falsity of that testimony? Yes, I'm saying that. I'm saying both of those witnesses here offered completely unbelievable testimony. Against the laws of nature. Against the laws of nature, yes. And how is that? Because Smith's claiming that she heard things when she admitted she also heard things in her head anyway. It's against the laws of nature to believe what she said she may have heard. And it's against the laws of nature for a person who's in jail, trying to find some way to get out of being in jail, to recount some claims that don't match up with the facts of the case. That's against the laws of logic or nature. Well, you know, let's talk about Bay. And that would be more like universal human experience. There are some people, will you agree, who will admit they have done wrong and are willing to take their consequences. Could be, yes. And so we're talking universal human experience. So it can't be Bay is looking for a better deal because some people may and some people may not. Bay is saying that this occurred while there were seven or nine other people in the lockup with them. And the state presents none of the other seven or nine. They know who those seven or nine were because they knew exactly what time Bay and my client were both brought. They could have figured out who those seven or nine people are. They could have said, called them to testify. Yeah, we saw two of them walk, talking in the corridor. But they didn't hear anything. And, again, the substance of what Bay testifies to, he didn't say my client said he hit a guy with a brick. He said my guy hit a guy with a table leg. And there's no evidence of any table legs anywhere like that. So the substance of what he's testifying to is contrary to what is known as a fact. With respect to Smith, she says that the defendant was, that she saw the defendant wearing camouflage shorts that night, which, and there is a pair of camouflage shorts with a drop of blood on them, right? Correct. My client admitted that. Just one second. She heard the radio playing. There is a radio there. We know that it does play and that you can adjust, although with the screwdriver, the volume and so forth. She did hear metal falling over in the basement. And in the basement, there is a metal bookshelf that has fallen over, right? Yes, correct. So there are some things about her testimony that were corroborated, right? Correct. But what isn't corroborated is the fact or the, we can't draw from that conclusion that at the moment she was there when the murder was taking place, she could well have been there when nothing was happening, but Bill Jacobson was in the basement playing around. We know from the testimony it was a very cluttered and unkempt house. And you can see from the pictures in the basement that it's a pretty messy basement with or without any homicide occurring there. And what she experienced, what she related, even if we believe it, even if we put aside all of her background and her reason for testifying, she doesn't put my defendant, my client, in the basement at that time. But none of those are inconsistent with him being in the basement at that time. No. Right? Not consistent with me being in the basement at the time. I mean, she happened to hear this noise. Okay. So what? And before we put a man in prison for 60 years, we ought to have a lot more. So for that reason, we ask this court to reverse this conviction. Thank you. Ms. Kripke. May I please support? Joan Kripke on behalf of the people of the State of Illinois Council. The first issue I would like to address is what appears to be a mistake in my brief regarding the address where the shorts were found. Apparently, I either misread it or did something. I didn't have the record. And when I went back to look at my brief, I was looking also at the stipulation as to where the shorts were found. I paraphrased it. So, again, I would just ask the court to check. Counsel is probably correct that I did make a mistake. But I don't think that affects the testimony. I mean, my mistake does not affect the testimony that was given and why the defendant was proven guilty beyond a reasonable doubt. The validity and the viability of the Collins standard is here and is still relied on by the courts all the time. And this jury should be given deference to the decision it made. It weighed all the discrepancies. It looked at all the contradictory testimony. It recognized the jury, heard these people speak. It knew that none of them was the teacher of the year. Yet they convicted. They found enough there to convict. And when the defendant says that they were inherently unreliable, improbable, whatever, I disagree. Although I would say that his client, the one statement that really stuck out to me that was inherently unbelievable, was his testimony about how the victim's blood got onto his shorts. And let's talk about something that's contrary to the laws of nature. He said that he was with Mr. Jacobson drinking beer on Mr. Jacobson's porch. It was summer. It was June. And there were lots of gnats and mosquitoes. Mr. Jacobson, and so they had the porch light out. No light. Yet he's able to see that Mr. Jacobson cannot open his beer can, that he breaks the tab off, has to go and get a pocket knife or some implement to punch a hole, and that he knows all that's going on with the light. Knows that he takes it and cuts his lip, spits into the wind, and lo and behold, this droplet comes back onto his shorts, and he knows all this and can see it all. What has now become a tiny little droplet, he can feel that go onto his shorts, and he's telling you that this is how Mr. Jacobson's DNA got onto his shorts in the form of blood. That is against the laws of nature. That makes no sense because there was no light on for all this to be going on. Well, on the other hand, we have a critical, you know, lethal wound on someone's head or the back of someone's head that produced a fair amount of blood on the floor and is likely to have presented, at least that would be the argument, or presented itself on the person or clothing of the assailant, and we don't have that, so we have these two things competing each other. But what we do have is the testimony of the forensic pathologist, or excuse me, scientist, who looked at the shorts. The conclusion was that there were 34 different areas which were suspect. They were all similar in color, and that the protocol of the forensics department was to test only one when they were all similar. So you're allowed to extract, and the jury is allowed to extrapolate from that, that if this is the defendant's blood, the rest of it could very probably be the defendant's blood. And yes, there was a lot of blood, but when we know that someone uses an implement to bludgeon someone to death, to create, with that amount of blood, usually the blood, it's not that it gushes out on the person. What happens is you get the blood spatter from the implement going back and forth and spraying it around the room, and it's not that you're going to be drenched in it because it's not going to, and he was hitting him in the back of the head. It's not like he hit a juggler and it's going to come spurting out on him. We're talking about this type of action, and so there are droplets of blood. I don't recall seeing a picture of it, and certainly the shorts weren't in evidence, so I don't know how big all these other 34, there were 34 patches that all appeared to be similar on the shorts. And again, it's circumstantial evidence, but the jury's allowed to make that inference. Why didn't the defendant admit to Ms. Smith that he had killed Mr. Jacobson? Well, he was in the lockup cell on June 22nd, and this occurred between June 20th and June 21st. So he was arrested almost immediately. It's not like weeks passed. The other important thing to note about what Prince Bay said is this. First of all, Prince Bay and the defendant both knew Patricia Smith, so if they're in the holding cell at the same time with other people, it could very well be that the victim, excuse me, that the defendant spoke to Prince Bay because they knew each other. He may not have known. That's one conclusion. We don't know if that's true, but Mr. Bay was saying we each knew Patricia Smith. The other thing that I think really speaks to me about this case is something that happened when I read the transcript. When I was reading the transcript, half of it had nothing to do with this case. And I kept saying, why am I reading about a case that has nothing to do with the charges underlying this? And then I realized why. Because the case that takes up the first half of the transcript is the one that Prince Bay was talking about. The defendant said to him, hey, I'm here on another case that involved a home invasion and I can't remember what else, and I didn't do that one. And, in fact, he was acquitted of it. That record is part of the record of that case. The transcript of that case is part of the record of this case. He said, but I killed a guy and I'm not in here on that. He said, I'm in here on something I didn't do. And it is absolutely corroborated by the record, 100%, because we have the entire transcript of that other trial, of that home invasion that took place right about the same time, or immediately prior to this incident in this case. And that lends a lot of credibility to what Prince Bay had to say. So he's willing to admit a really bad thing, but he didn't do it and he's going to stand on it. He didn't do the home invasion and he's going to stand on that and the principle, and this makes him more credible because he admits the murder, but he denies it. Not the defendant. No, no, I'm talking about Prince Bay. Prince Bay didn't admit to doing nothing. Okay, all right, well then the defendant, I'm sorry, the defendant. Prince Bay is relating what the defendant said to him. And we can, and Prince Bay is credible because we know that's true because that other event of which the defendant claimed he was innocent and indeed of which he was convicted is the first half of this transcript in this case. I was reading the transcript and I said, what does this have to do with the price of fish? Why am I reading a transcript from something else that is not underlying this case? Yet when you get to Prince Bay's testimony, you find out I still don't know why the two were combined. Well, yes, I do know why the two were combined because the state had to elect on which case they were about to go forward on and they elected to go forward on the other case first, which accounts for the large gap in time on why this case was prosecuted so much later after the offense was committed. And that's why Prince Bay is credible. Now, was Prince Bay kind of a bad guy? Absolutely. I mean, this guy's selling heroin and all these other things. But he said, and he's a felon, he's a convicted felon. He said, I was given no consideration, he said, from the state's attorney's office on this case. I went to trial or I pleaded, I can't remember what, on my other cases. I was sentenced before I ever came here and nobody offered me any consideration on those other sentences. And he also said the sentencing for which he was going to get 4 to 40 with the federal government, he said there was no agreement whatsoever with the U.S. attorney's office in that case for his testimony in this case. Now, let's talk about Patricia Smith, the lady with the bad history of all kinds of felonies and crimes and inability to remember. I thought her testimony, even when read, as we see in the black and white record and we can't see the emotion, just showed it out to me in almost a humorous manner. I thought she sounded very credible. When they said, oh yeah, but you hear voices. So the fact that you heard the victim crying out Ed in the basement, you heard voices. Therefore, you heard that too. And she said, no, when I heard voices, I heard people calling my name. They were never calling Ed when I was having my bipolar disorder hallucinations. And that spoke to me as being a very true statement. And it's not that she just said, oh yeah, I heard the victim calling out Ed. She went on to say that she distinguished the tone of voice that was being used because the defense attorney said, well, maybe he was asking Ed for help. And she said, no, that's not what he was saying. She said it sounded as if Ed was, you know, the tone of voice being used by the victim implied that the defendant, Ed, was doing something irrational toward the victim and that he was like, you know, trying to set him off or stop him from doing it. That was very credible testimony. There was something else that she said that I wanted to bring up. I can't remember right now. Oh, also going back to Prince Bay and what he said about this particular incident. He said repeatedly, look, it took place four years ago. I'm trying to remember what the defendant told me. He said that he hit the victim in the head, and we know that that is true. He said, with I think a table leg or something. He was not positive about it. There was no table leg found, but we do know that the victim had blood force trauma to his head, and that is what killed him. He said, I can't remember what he told me. I mean, these are little snippets being whispered in a holding cell. Did the jury know that there were other people in the holding cell? I mean, that was part of the record. There were several other people in the holding cell, and these two are having this rather revealing conversation. I don't remember how it came out that we knew that there were other people in the holding cell. I can't answer that because I really don't remember. And also the issue that the defendant said, no, excuse me, that Prince Bey testified that the defendant said to him, I hit the old man in the head. Well, Prince Bey was in his mid-50s. The victim was 51, and the defendant was in his mid-40s. The defendant was not older than the victim. Regardless of who was what age, it's irrelevant because it's the subjective impression or the testimony of the defendant. It wasn't Prince Bey saying, oh, he hit an old man. He's repeating what the defendant said to him, and if the defendant wanted to use the words old man when he spoke to him or perceived of him as an old man, that does not bear on the credibility of either Prince Bey. It does not bear on his credibility. He's just repeating what he said was said to him by the defendant in the holding cell. So when you take all of this together and you look at all these facts together, we do have corroboration of Patricia Smith's testimony. She said the radio was on. Maybe she turned it off. We don't know. Maybe she could hear over the radio. And then there was another policeman who came in and said the radio wasn't on. So, look, it was either on or it wasn't on. Whether they could hear over the noise or couldn't is not relevant to whether Patricia Smith could hear it, but she did say, I heard metal falling. She repeated that. And, lo and behold, in the basement you have corroborative physical evidence of the shells having fallen over on the floor near the puddle of blood from the victim's head and near his eyeglasses. And that is corroborative evidence. Again. Where do we have the brick? I can't recall. The brick? In the vicinity? I cannot remember.  But she didn't say she heard the brick. What she said to us, she heard that metal. She heard something metal, something like tin falling. She didn't know what the metal shelving is like. That's a very credible statement. Another time, I think the other thing I was trying to say is that the defense attorney was trying to press her on the fact that she had changed her testimony. She said, you keep asking me this question as if you're trying to prove that I'm lying. I'm not lying to you here. She said, this is what I saw. And she also said in regard to the blinds, which everybody has their own standards of how they believe things are theirs in different ways, and that was her stand. She said, well, he was going to give it to me anyhow, so I took it. Fine. That may not be something that we do. However, she said, I told the police about it. She said it wasn't like she took something that she felt that she was stealing. She said there were 50. I don't know. Somebody else said there were three. She took the one that she felt was owed to her. Whether she feels that's stealing or not is a different issue. We're not looking to her for her legal analysis of whether or not that is theft. But it's how she represented herself to all these people. And, yes, she has this history. And, yes, all these people have, all of the people, the defendants as well. None of them is credible. If you're going to look at their background, then you can't convict anybody. When you're talking about we don't have the teacher of the year, I stood before this court twice and argued about a man who was considered a very fine teacher out in the Hinsdale school system. And he's now serving 48 years for having sexually assaulted two high school students. So who in that case do you take? I mean, if you're going to look at the background of the people, should you believe the teacher or should you believe the high school students, one of whom was troubled? So who do you believe? If you're going to look at the troubled background, are you going to look at exactly what they said and how it hung together and take it all into account with the discrepancies and the lapses of memory? And the jury was absolutely entitled to find this man guilty beyond a reasonable doubt. And we ask you to affirm. So let's ask you the same question I think that Justice Jorgenson asked Mr. Glazer. Is it the testimony, is it the strength of the testimony of the person conveying that testimony? Or must they be combined and taken as a whole? You have to take it as a whole. You have to take it as a whole. But you can't just say, I mean, and the case law says it, just because you're not allowed to give an instruction saying anything about the inherent credibility of somebody because they're a drug addict in the past or present. You're not allowed to. The jury may be made aware of that. Now, in this case, when they're going after Patricia Smith because she has bipolar disorder and she can't remember things, the defendant had every opportunity to file a motion in limine to come in and attack her credibility based on her mental capacity. Yet he did not do that. So I can't remember the exact language in that long quote I put in here about how the courts have held that the trial judge should consider four factors. The ability of the witness to receive correct impressions from his senses, to recollect those impressions, to understand questions, and to appreciate the moral duty to tell the truth. Now, what here, I mean, it was clear that Patricia Smith had the ability to receive a correct impression. She distinguished the tone of voice being used by the victim as he called out Ed's name and said, no, and she corrected the defense attorney. She said, no, he wasn't asking for help. He was saying something that implied that something that the defendant or the person attacking him, and we're saying it's the defendant, was doing something irrational. And she used the word irrational. So she was able to perceive that despite her bipolar problems. How do we know, as counsel pointed out, that that's the time that the alleged homicide was taking place? That what? How do we know that at the time that Ms. Smith heard Ed that a confrontation was taking place in the basement? Well, she was saying she believed it was because of the tone of voice. Also, she heard the metal shelf falling. Now, we don't know, but we're able to extrapolate. I mean, we can't say we can't pinpoint it because nobody saw it. But unless somebody was into, I mean, I don't think maybe somebody just picked up the shelf and threw it down, but there was blood spatter on the shelf as well as on the refrigerator. So the conclusion, the inference that you can draw is that as the. Well, that would be a lay inference because the expert said there was not a sufficient spatter to draw any conclusions, correct? But there was spatter. Would that be a yes? Yes. That's correct? Okay. Yes, but. I mean, yes, but. But the jury's also allowed to make its own inferences. There was all this other blood on the floor. There was a brick near the man's head. His glasses are off. Excuse me. Maybe forensically they can't say that this happened at that exact time. Nevertheless, the blood spatter was there, and it wasn't old blood spatter. It was consistent with what had been going on with the rest of the blood found at the scene. The rest. Are there any other questions? I think we're. Okay. Thank you. Thank you very much. The Arts Council has been almost convinced that Patricia Smith is citizen of the year. She wanted to help the police solve this crime here. She says that she admitted that she took the blinds from the victim's house, but she also told the police that she took the blinds from the victim's garage. So her testimony is more consistent. She also says she heard this noise from the basement. That was a pretty messy basement. The victim was found in a real bad condition. First, he was dead, and I'm not trying to be smart about that, but also his pants were pulled down a little bit. His shoes were off. There was a major, major struggle going on down in that basement, and all Patricia heard was a metal shelf going down. Surely if there was this life and death violent physical struggle going on, she would have heard a lot more than just a metal shelf and someone saying someone's name. Counsel is correct. My client is only in his mid-40s. I apologize for getting back and forth on that. But still, a difference between 44, which is what my client was when he first appeared in court, and 50 of Jacobson is not so much that I think you could call Jacobson an old man. When I was 18, I called people 21 old. Well, I have more respect than whatever. Kia Brown, the forensic, the DNA tester from the state police lab. Again, I'll tell my client, sorry, Mr. Bryant, but the state only has a protocol for one test, so that's all you get. Sorry. That shouldn't be the rule. Again, it was a bloody scene. How am I going to change that rule, or how are we going to change that rule in this decision? We're not scientists, nor are we the Supreme Court. We judge a case not on the weakness of the offense case, but on the strength of the state's case. And the state had all this evidence, all this stuff, four years before trial, to test this stuff, to make it conclusive that there's some of the victim's blood on my client's clothes, and they didn't come up with it. They didn't come up with an explanation about the car. They didn't come up with an explanation about the blinds, about the ATM transaction. Again, the jury was troubled about that, but there was no evidence presented. The state shouldn't have presented the evidence. At the bottom line, whatever they're troubled about, that they deliberate and they weigh it all and make a determination. And sometimes a determination can be wrong, and this court has the authority to say that they're wrong. Go back to the Reddish-Brown thing. Kia Brown said there were 34 areas. She said 34 areas of Reddish-Brown. I don't know how she collects these, but whatever. She tested the shoes and the socks, and there was no blood on there. Officer or Detective Chimaitis said he collected the shoes and socks because he saw Reddish-Brown. There would appear to be bloodstains on the shoes and socks. Just because something may appear to be bloodstains doesn't mean it's necessarily there are bloodstains. And the fact that we have some of my client's blood mixed up in that DNA, he said he usually wore these shorts a lot. This was not a very hygienic place he lived in. I don't know how often he did laundry, but it's obviously a mess. And he wore those shorts to do his odd jobs, and he did some yard work, whatever else he did. He probably had blood on his shorts as well. So that doesn't, again, there's no conclusive testimony from the crime lab on this. As far as the state's mistake on the address, I can understand how the state would get the addresses wrong. Because Patricia Smith said she lived at 624 Whitman, when it was actually 634 Whitman, I think, if I'm right. She even got her address wrong. So I don't think that even if we, you know, accept Smith for all the light and want to shine all the light you want on his testimony, it doesn't prove who committed the crime here. Thank you. Thank you again, counsel, for being here and then your arguments. And we will make a decision in due course, and we will take our final recess.